The **PEOPLE** of the State of Colorado, Plaintiff-Appellee,

v.

Robert Floyd **THATCHER**, Defendant-Appellant.

No. 79SA390.

Supreme Court of Colorado, En Banc.

Dec. 21, 1981.

Rehearing Denied Jan. 25, 1982.

762

was reading by the light of a Coleman lantern, she heard noises outside the tent. Soon thereafter, a man entered the tent, turned off the tent light and put his hand over the victim's mouth and eyes. She tried to scream. The intruder hit her on the back of the head with a blunt object and told her to keep her mouth shut if she did not want to get cut.

The intruder, who was barefoot, pushed the victim out of the tent and, holding her by the neck at arms length, pushed her along a rough path through woods to an abandoned trailer approximately 400 feet from her family's tent. He told her to lie down on a bed at the rear of the trailer where he attempted to force her to engage in fellatio. The victim resisted, after which the attacker forced her to engage in vaginal intercourse for ten to fifteen minutes. Then he attempted to penetrate the victim anally, at which she screamed in pain. The attacker hit her on the back of the head and told her to shut up or she would really get hurt. The victim had two opportunities to see her assailant's face: once, from about a foot away, when he switched on his flashlight, and a second time, from about eighteen inches, when a car drove by and its lights shone into the trailer.

When the car drove past, the victim said, "It must be my husband looking for me." At this, the man got up, told the victim not to move, dressed quickly and left. Soon after, the victim returned to her tent to make sure her daughter was safe. A few minutes later, her husband returned to the campsite and took her and their daughter to the home of the Montrose County sheriff.

On August 9, 1977, the victim identified the defendant, who was incarcerated in the Montrose County Jail on charges stemming from another sexual assault, in a lineup. On August 31, 1977, the defendant was charged by information in San Miguel County District Court with one count of first-degree sexual assault. The defendant

J. D. MacFarlane, Atty. Gen., Richard F. Hennessey, Deputy Atty. Gen., Mary J. Mullarkey, Sol. Gen., Maureen Phelan, Asst. Atty. Gen., Denver, for plaintiff-appellee.

J. Gregory Walta, Colo. State Public Defender, Shelley Gilman, Charles Greenacre, Deputy State Public Defenders, Denver, for defendant-appellant.

DUBOFSKY, Justice.

The defendant Robert Floyd Thatcher appeals his conviction in the district court of San Miguel County of first-degree sexual assault under section 18–3–402(1)(b), C.R.S. 1973 (1978 Repl.Vol. 8).[1] We affirm the judgment of conviction.

On the evening of Friday, July 8, 1977, the victim and her two-year-old daughter were alone in a tent in which they were living outside of Telluride. The victim's husband had gone into town at about 8:00 p. m. About midnight, while the victim

1. This case was transferred here from the Court of Appeals under sections 13–4–110(1)(a) and 13–4–102(1)(b), C.R.S.1973, because the defendant challenged the constitutionality of the first-degree sexual assault statute, section 18–3–402, C.R.S.1973 (1978 Repl.Vol. 8) on its face and as applied.

moved to suppress the lineup identification, and, after a suppression hearing on January 23, 1978, the prosecution stipulated that it would not use the lineup testimony at trial unless the defendant raised the issue. The trial court then ruled that there was an independent basis for an in-court identification of the defendant. On May 24, 1978, after a three-day trial, the jury found the defendant guilty of first-degree sexual assault. The trial court sentenced him to a term of not less than fifteen nor more than twenty years in the penitentiary.

On appeal, the defendant argues that the first-degree sexual assault statute violates constitutional guarantees of due process and equal protection. He also argues that the court's refusal to grant a discovery motion for information in the prosecution's possession violates Crim.P. 16 and his due process rights under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The defendant also contends that admission into evidence of a mug shot and of testimony concerning the condition of his feet while incarcerated in the Montrose County Jail was reversible error because it disclosed unrelated criminal activity to the jury. The defendant's other arguments are that the victim's in-court identification was tainted by the lineup and that no independent basis for the identification existed, and that the trial court, in allowing the victim to testify that she had heard the defendant's voice prior to trial and subsequent to the assault, had revealed to the jury inadmissible evidence of the lineup; that emotional displays by the victim's husband during closing arguments and a view by some jury members of the scene of the assault denied him a fair trial; and finally, that the court committed reversible error by refusing to give to the jury tendered instructions on burden of proof and credibility of eyewitnesses. We conclude that the defendant's contentions are without merit and affirm his conviction.

**I.**

The defendant was convicted of first-degree sexual assault under section 18–3–402(1)(b), C.R.S.1973 (1978 Repl.Vol. 8), which provides:

*Sexual assault in the first degree.* (1) Any actor who knowingly inflicts sexual penetration on a victim commits a sexual assault in the first degree if:

. . . . .

(b) The actor causes submission of the victim by threat of imminent death, serious bodily injury, extreme pain, or kidnapping, to be inflicted on anyone, and the victim believes that the actor has the present ability to execute these threats.

"Sexual penetration" is defined in section 18–3–401(6), C.R.S.1973 (1978 Repl.Vol. 8), as:

sexual intercourse, cunnilingus, fellatio, analingus, or anal intercourse. Emission need not be proved as an element of any sexual penetration. Any penetration, however slight, is sufficient to complete the crime.

"Serious bodily injury" is defined in section 18–1–901(3)(p) as:

bodily injury which involves a substantial risk of death, serious permanent disfigurement, or protracted loss or impairment of the function of any part or organ of the body.

The defendant argues that the first-degree sexual assault statute violates constitutional guarantees of due process and equal protection. Specifically, he alleges that the phrase in the statute, "threat of . . . serious bodily injury," is unconstitutionally vague, that the statute is not constitutionally distinguishable from the second-degree sexual assault statute,[2] and that the statute as applied violates due process by permitting a third party to determine the degree of criminal liability.

▮ The defendant's first contention is that the phrase "threat of . . . serious bodi-

---

**2.** We upheld the constitutionality of the second-degree sexual assault statute, section 18–3–403, C.R.S.1973 (1978 Repl.Vol. 8) against vagueness and overbreadth challenges in *People v. Johnson, et al.,* Colo., 638 P.2d 1 (1981).

ly injury" is so vague that it violates the due process requirements of precision and clarity. In *People v. Heckard*, 164 Colo. 19, 431 P.2d 1014 (1967), this court enunciated the standard a statute must satisfy to accord due process. The legislature must

> frame criminal statutes with sufficient clarity so as to inform persons subject to such laws of the standards of conduct imposed, i.e., give a fair warning of the forbidden acts. *Cline v. Frink Dairy Co.*, 274 U.S. 445 [47 S.Ct. 681, 71 L.Ed. 1146] (1927); *Memorial Trusts v. Beery*, 144 Colo. 448, 356 P.2d 884 (1960).

Statutes "must also provide the police and prosecution with clearly defined standards" which "lessen the effect of personal judgments and discrimination upon enforcement processes" and "inform a court and jury whether a crime has been committed and proved." *People v. Heckard, supra.* See *People v. Hines*, 194 Colo. 284, 572 P.2d 467 (1977).

The first-degree sexual assault statute is not unconstitutionally vague under the standard set out in *Heckard*. The statute sets out the act ("sexual penetration"), the requisite mental state ("knowingly"), and the content of the threat used to force the victim's submission ("threat of . . . serious bodily injury") and each of these elements is defined.[3] The term upon which the defendant focuses, "serious bodily injury," has been applied in a number of instances. *See, e.g., People v. Martinez*, 189 Colo. 408, 540 P.2d 1091 (1975); *People v. Thompson*, 187 Colo. 252, 529 P.2d 1314 (1975).

The defendant contends that defining "serious bodily injury" is more difficult in the context of the sexual assault statute since here the definition encompasses a threat in the absence of the actual injury threatened. We have held statutes which require intent to cause serious bodily injury sufficiently clear to avoid a due process infirmity, *People v. Benjamin*, 197 Colo. 188, 591 P.2d 89 (1979), even as applied to cases where no actual injury is inflicted. *People v. Jackson*, 194 Colo. 93, 570 P.2d 527 (1977). Certainly, intent is no more concrete than are threats. Indeed, while threats typically are uttered aloud, intent usually must be inferred from surrounding circumstances.

The victim testified at trial that on two occasions during the assault her assailant struck her and told her to keep quiet or she would get hurt. The statute, which requires threats of serious bodily injury, is written with sufficient clarity to provide the required guidance. *People v. Hines, supra.*

The defendant's second contention is that the acts proscribed by the first-degree sexual assault statute cannot be distinguished from those covered by the second-degree sexual assault statute and that the absence of a difference violates equal protection. Criminal liability for second-degree sexual assault requires sexual penetration where "[t]he actor causes submission of the victim . . . by any means other than those set forth in section 18–3–402 [first-degree sexual assault statute], but of sufficient consequence reasonably calculated to cause submission against the victim's will." Section 18–3–403, C.R.S.1973 (1978 Repl. Vol. 8). The defendant contends that the first-degree statute punishes more severely acts indistinguishable from those described in the second-degree statute and thus violates the equal protection guarantees of "like treatment of all those who are similarly situated." *People v. Calvaresi*, 188 Colo. 277, 534 P.2d 316 (1975). We have frequently reiterated the principle that "[c]lassification of persons under the criminal law must be under legislation that is reasonable and not arbitrary. There must be substantial differences having a reasonable relationship to the persons involved and the public purpose sought to be achieved."

---

**3.** The requisite mental state, "knowingly," is defined in section 18–1–501, C.R.S.1973 (1978 Repl.Vol. 8): "A person acts 'knowingly' . . . with respect to conduct or to a circumstance described by a statute defining an offense when he is aware that his conduct is of such nature or that such circumstance exists . . . or . . . , with respect to a result of his conduct, when he is aware that his conduct is practically certain to cause the result."

*People v. Czajkowski*, 193 Colo. 352, 568 P.2d 23 (1977); *People v. Calvaresi, supra; Dunbar v. Hoffman*, 171 Colo. 481, 468 P.2d 742 (1970). Even if, as a matter of due process, the statute clearly defines the act which is prohibited, the statute must still stand apart from enactments punishing similar forms of conduct. *People v. Favors*, 192 Colo. 136, 556 P.2d 72 (1976). The distinction must be sufficiently apparent to be intelligently and uniformly applied, with reasonable certainty in result. *People v. Benjamin, supra; People v. Favors, supra; People v. Calvaresi, supra.*

We have repeatedly affirmed that "[t]he General Assembly [is] free to prescribe different punishments for conduct it may have rationally perceived to have different degrees of social reprehensibility." *People v. Johnson*, 195 Colo. 350, 578 P.2d 226 (1978); *People v. Hulse*, 192 Colo. 302, 557 P.2d 1205 (1976). *See People v. Brake*, 196 Colo. 575, 588 P.2d 869 (1979). The legislature is also entitled to establish more severe penalties for acts which it believes have greater social impact and graver consequences. *People v. Montoya*, 196 Colo. 111, 582 P.2d 673 (1978); *People v. Czajkowski, supra.*

To be constitutionally distinguishable, acts need not be different in kind. A difference in *degree* is significant enough in light of the legislative power to prescribe stricter penalties for acts having graver consequences. *People v. Benjamin, supra.* The gravity of the injury sustained, or even intended, can be sufficient distinction. *People v. Jackson, supra.* As we stated in *People v. Jackson, supra*, "We believe it obvious to a juror that 'serious bodily injury' has as a threshold requirement a greater degree of intended injury than 'bodily injury.'" 570 P.2d at 528.

The statutes at issue here do not specifically require that a distinction be made between serious bodily injury and bodily injury. They distinguish only between threats of serious bodily injury and other threats reasonably calculated to cause submission. Certainly, threat of serious bodily injuries implies graver consequences for the victim, especially since the statute further requires that the victim believe that "the actor has the present ability to execute [the] threat." It is reasonable for the General Assembly to have concluded that putting a victim of sexual assault in fear—and in danger—of losing life or limb is a graver and more morally reprehensible act than subjecting the victim to lesser threats. The two kinds of threats are constitutionally distinguishable. *See People v. Benjamin, supra; People v. Elam*, 198 Colo. 170, 597 P.2d 571 (1979); *People v. Jackson, supra.*

█ The defendant's final contention is that section 18–3–402(1)(b) violates due process by permitting a third party to determine the defendant's degree of criminal liability. *People v. Vinnola*, 177 Colo. 405, 494 P.2d 826 (1972). He argues that the statute predicates the seriousness of the offense upon the victim's perception of the magnitude of the threat. The defendant misconstrues the agency evaluating the threat. It is for the jury to decide the magnitude of the threat and to evaluate the victim's belief of the defendant's ability at the time the threats were made to carry them out. The victim testified that the defendant stated that he would "cut" her and that she would "really get hurt." This testimony and the brutal circumstances of the assault were sufficient for the jury to find threats of serious bodily injury and present ability to carry them out. *See People v. Johnson, et al.*, Colo., 638 P.2d 1 (1981). We find no constitutional defect in the first-degree sexual assault statute.

## II.

█ As part of the defendant's case, four witnesses testified that they had seen the defendant in and around Denver on Friday, July 8 and Saturday, July 9, 1977, thus giving the defendant an alibi for his whereabouts at the time of the sexual assault. On rebuttal, the prosecution called nine witnesses who testified that they had seen the defendant in the area where the assault took place on July 8th and July 9th. Prior to commencement of rebuttal, the defense

moved to compel discovery of written notes made by prosecution investigators after interviewing the rebuttal witnesses. The trial court examined the notes *in camera* and refused to compel discovery of them because it would interfere with the progress of the trial and the notes did not contain exculpatory information. The defendant argues that the trial court's refusal to compel discovery of material required to be disclosed under Crim.P. 16 was an abuse of discretion and violated the defendant's due process rights to a fair trial.

Crim.P. 16, entitled "Discovery and Procedure Before Trial" provides:

(a) *Prosecutor's Obligations.*

(1) ... [T]he prosecuting attorney upon request of the defense counsel shall disclose to the defense counsel the following material ...:

(I) The names and addresses of persons whom the prosecuting attorney intends to call as witnesses at the hearing or trial, together with their relevant written or recorded statements.

Crim.P. 16(a)(3) provides:

[T]he prosecuting attorney shall disclose to defense counsel any material or information within his possession or control which tends to negate the guilt of the accused as to the offense charged....

Crim.P. 16(b)(2) provides:

The prosecuting attorney may perform these obligations in any manner mutually agreeable to himself and defense counsel or by:

(I) Notifying defense counsel that material and information described in general terms, may be inspected ... during specified, reasonable times; and

(II) Making available to defense counsel at the time specified such material and information....

The prosecution contends that even if one or more of these provisions is applicable, the investigator's notes fall under the "work product" exception of Crim.P. 16(f) which provides:

Disclosure shall not be required of legal research or of records, correspondence, reports, or memoranda to the extent that they contain the opinions, theories, or conclusions of the prosecuting attorney or members of his legal staff.

The prosecutor argues that this exception includes notes or worksheets intended to guide the prosecutor in his examination of witnesses. *Norman v. People,* 178 Colo. 190, 496 P.2d 1029 (1972); *Rapue v. People,* 171 Colo. 324, 466 P.2d 925 (1970). However, notes are discoverable if they are in substance recitals of oral statements made by witnesses. *Goodwin v. District Court,* 197 Colo. 6, 588 P.2d 874 (1979); *Ortega v. People,* 162 Colo. 358, 426 P.2d 180 (1967).

From our examination of the investigator's notes, we conclude they are in essence recorded oral statements of witnesses. The notes include a few statements which are nondiscoverable comments or interpretation and all the notes recount testimony in the third person, *e.g.,* "She states that ..." "He says that ...", but the majority of the notes are in substance a record of oral statements made by the witnesses and thus not protected by the work product exception. *Goodwin v. District Court, supra.*

■ Crim.P. 16(a)(1)(I) requires disclosure of recorded statements of witnesses upon request of defense counsel. Such a request was made prior to trial, and the prosecutor complied by letter, making available to defense counsel all the material in its files; defense counsel failed to take advantage of the opportunity to examine the files and did not raise the matter until trial was in progress. Under these circumstances, the trial court did not abuse its discretion. It is within the sound discretion of the court to refuse to compel discovery of what may be relevant testimony where defense counsel had the opportunity and failed to institute timely discovery. *People v. Duncan,* 179 Colo. 253, 500 P.2d 137 (1972). A trial court's discovery ruling may consider judicial economy as long as constitutional rights are not violated. *See Roybal v. People,* 177 Colo. 144, 493 P.2d 9 (1972).

■ The defendant here contends that failure to compel discovery also abridged his due process rights as enunciat-

ed by the United States Supreme Court in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and its progeny. In *Brady*, the Court held that the due process clause of the Fifth Amendment requires the prosecution to disclose evidence favorable to the defendant upon request by defense counsel. This due process right is equally applicable to trials in state courts under the Fourteenth Amendment. *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). In *People v. Smith*, 185 Colo. 369, 524 P.2d 607 (1974), we quoted with approval Justice Fortas' concurrence in *Giles v. State of Maryland*, 386 U.S. 66, 87 S.Ct. 793, 17 L.Ed.2d 737 (1967), requiring that a court compel discovery not only of favorable evidence but of any evidence "which may ... be of material importance to the defense—regardless of whether it relates to testimony which the state has caused to be given at trial." 524 P.2d at 611 *quoting* 386 U.S. at 87, 87 S.Ct. at 803. Where the defense has made a specific request for certain information in the possession or control of the prosecution, discovery of that information is constitutionally compelled, not only when it is exculpatory, but when it is "of material importance to the defense." Defense counsel wanted the investigator's notes to gain material for impeachment of the prosecution's rebuttal witnesses. The use of discovery material for impeachment purposes implicates the due process rights of the defendant. *Goodwin v. District Court, supra*, and is of material importance to the defense. Thus, the investigator's notes are within the scope of material which must be disclosed.

However, *Brady* made clear that the aim of compelling discovery of exculpatory information is a fair trial for the defendant, and subsequent cases have clarified that reversal on the basis of failure to disclose certain information to the defendant is mandated *only* where the information might have affected the outcome of the trial. *United States v. Agurs, supra; Moore v. Illinois*, 408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972). In *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), the Court noted that

due process does not "automatically require a new trial whenever a combing of the prosecutor's files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict."

Here, defense counsel or his investigator had spoken with all but one of the nine rebuttal witnesses. Defense counsel cross-examined all of them effectively, bringing out a number of inconsistencies and ambiguities in their testimony. The investigator's notes would have added little, if anything, to the defense counsel's information and effectiveness during cross-examination. Therefore, even assuming *arguendo* that the prosecution's pre-trial offer of access to all materials in its file was not in itself adequate to answer the defendant's due process argument, we hold that failure to disclose the notes of witness statements midway through trial was harmless error beyond a reasonable doubt and does not mandate a new trial in this instance.

### III.

At trial, the court admitted into evidence, over defense counsel's objection, a "mug shot" of the defendant. It shows a front and side view of the defendant from the waist up with a placard hanging from his neck bearing an identification number and the date 7–22–77. In the background, the words "Montrose" and "Sheriff" are discernible. The defendant contends that the admission of this photograph is reversible error because it made the jury aware of unrelated criminal activity and was therefore prejudicial. The prosecution argues that the photograph was probative evidence buttressing the victim's identification of the defendant as her assailant because it established his appearance close to the time of the assault, and his appearance had changed by the time of trial.

Also in dispute is testimony that the defendant, while incarcerated in the Montrose County Jail one month after the assault, went without shoes and had thickly calloused feet. Again, the defendant contends

that the testimony about the condition of his feet in jail made the jury aware of unrelated criminal activity and is prejudicial. The prosecution contends that this testimony showed that the defendant had feet similar to those of the assailant, who the victim testified was barefoot when he pushed her along a rough, unpaved road.

We have held on many occasions that in a criminal trial to a jury, evidence of a defendant's unrelated criminal activity is inadmissible unless introduced to prove a proposition material to the offense. *People v. Goldsberry,* 181 Colo. 406, 509 P.2d 801 (1973). In *People v. Bugarin,* 181 Colo. 62, 507 P.2d 875 (1973), we held that "mug shots" clearly imply criminal activity and may not be introduced unless their probative value outweighs their prejudicial effect. However, in *Bugarin* we also made it clear that they may be introduced where relevant to the identification of the defendant and introduced for that limited purpose with a cautionary instruction. *See People v. Goldsberry, supra.*

█ An accurate photo is admissible if it appears clear to the jury that the photo was taken at the time of the defendant's arrest for the offense being tried. *People v. Beeman,* 37 Colo.App. 417, 551 P.2d 726 (1976), *reversed on other grounds,* 193 Colo. 337, 565 P.2d 1340 (1977). Here the photo and defendant's subsequent incarceration in the Montrose County Jail were in connection with a subsequent sexual assault allegedly committed by the defendant. However, absent this explanation, the jury could conclude that the "mug shot" and incarceration were in connection with the defendant's arrest for the offense being tried.

While the probative value of both pieces of evidence is marginal, they appeared to have no prejudicial effect at all, in light of the jury's logical conclusion that they were merely evidence of defendant's arrest for the charge involved in this case. Therefore, the admission of this evidence did not constitute reversible error.

## IV.

The defendant next contends that he was denied a fair trial because of emotional displays by the victim's husband during closing arguments and the trial court's failure to take corrective action. After the jury had retired to deliberate, a deputy district attorney present in the courtroom testified at an *in camera* hearing that the victim's husband, upon returning from an absence from the courtroom during closing arguments, tapped on a post immediately behind the defendant. He then sat down in the front row of audience seats, just behind his wife, who sat at the prosecution table. The husband leaned forward to borrow a cigarette from his wife and kissed her cheek or the back of her neck. At the hearing, the trial judge stated that he had seen the husband tap the rail behind the defendant but not the behavior between husband and wife and ruled that the husband's behavior, while less than desired, did not prejudice the defendant.

█ The right to a fair trial includes the right to a trial free from audience demonstrations which may intimidate or prejudicially affect the jury. *See People v. Green,* 183 Colo. 25, 514 P.2d 769 (1973). In cases of audience misbehavior, a mistrial need be granted only in extraordinary circumstances to prevent an injustice and should be left to the discretion of the trial judge who is in the best position to judge the effect the impropriety might have on the jury. *Hafer v. People,* 177 Colo. 52, 492 P.2d 847 (1972).

█ Here, the deputy district attorney testified that the jury did not notice the husband tap the post behind the defendant. The witness was not aware whether the jury noticed the kiss. An instruction to the jury to disregard the husband's behavior might have had the effect of calling unnoticed acts to the jury's attention. The trial court, informed by defense counsel of a possible impropriety, immediately held a hearing. The judge was present during the incidents and decided that the husband's admittedly improper acts did not require a mistrial. The trial court's decision was within its sound discretion.

## V.

After the jury returned its verdict, defense counsel learned that some of the jurors had observed the scene of the assault and discussed their observations with other jurors during deliberations. The defendant moved for a new trial and also requested a hearing on this alleged jury impropriety. Both prosecution and defense counsel filed their own affidavits setting forth their post-trial discussions with various jurors. On the basis of the facts in the affidavits, the court ruled that any jury impropriety did not reach the level of prejudicial error.

On May 23, 1978, the jury deliberated for two hours and was then excused for the evening. According to an affidavit filed by the prosecution, one juror stated that prior to being excused, the jury had voted 11–1 for conviction of the defendant. Several of the jurors had to pass the scene of the crime on their way home from court. These jurors apparently observed the scene and discussed their observations with other jury members the next day. The court determined that merely viewing the scene was not prejudicial error in this case and denied the defendant's motions for a hearing or a new trial.

 A determination that the defendant was not prejudiced by alleged jury misconduct is within the sound discretion of the trial court, *Beeman v. People*, 193 Colo. 337, 565 P.2d 1340 (1977), and only where that discretion has been abused will a new trial be ordered. *People v. Reed*, Colo.App., 598 P.2d 148 (1979); *People v. Mackey*, 185 Colo. 24, 521 P.2d 910 (1974). Independent investigation by jurors violates the defendant's right to confront witnesses and to have his guilt or innocence determined solely on the evidence admitted at trial. *See People v. Reed, supra; Beeman v. People, supra.* Here, however, the view was not an unauthorized inspection tour but merely a casual observation of the scene made by jurors who had to pass it to reach their homes. The layout of the area where the assault took place was not crucial to a determination of the important contested issue in the case, the identity of the assailant.

We agree with the trial court that the view of the scene by the jurors, while improper, was not so prejudicial as to mandate a new trial. The court's refusal to hold a full evidentiary hearing on the jury misconduct was also justified. Affidavits presented to the court stated the relevant facts. Neither the prosecution nor the court disputed defense counsel's allegations, and the court's ruling was sound even assuming all the allegations to be true.

## VI.

On August 9, 1977, the victim identified the defendant from a five-man lineup as her attacker. Although the trial court did not rule that the pre-trial lineup was impermissibly suggestive, and in fact indicated that proper procedures had been followed, the prosecution stipulated before trial that it would not introduce the victim's lineup identification at trial. The defendant argues, apparently on the basis of this stipulation, that the victim's in-court identification of the defendant was based on "impermissibly suggestive" pre-trial procedures, rather than on the victim's independent recollection of the assault itself, and therefore was inadmissible.

 The trial court determined at a suppression hearing on January 23, 1978 that the witness' testimony would be admitted at trial because she had a sufficient independent source of identification. Assuming *arguendo* that the lineup identification was unduly suggestive and should have been suppressed, the in-court identification was permissible if it is established by clear and convincing evidence that the in-court identification was not the product of the suggestive procedure, but rather arose from an independent source. *United States v. Wade*, 388 U.S. 218, 240, 87 S.Ct. 1926, 1939, 18 L.Ed.2d 1149 (1967); *Huguley v. People*, 195 Colo. 259, 577 P.2d 746 (1978); *Sandoval v. People*, 180 Colo. 180, 503 P.2d 1020 (1972); *Fresquez v. People*, 178 Colo. 220, 497 P.2d 1246 (1972); *Constantine v. People*, 178 Colo. 16, 495 P.2d 208 (1972). In *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), and *Manson v. Brath-*

*waite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), the United States Supreme Court set out the factors which determine the existence of an independent source of an identification: the witness' opportunity to view the criminal at the time of the crime; the witness' degree of · attention; the accuracy of the witness' prior description of the criminal; the level of certainty demonstrated by the witness at the confrontation with the defendant; and the length of time between the crime and the confrontation. *Huguley v. People, supra. See United States v. Wade, supra.*

 Here the victim testified that her assailant held her captive for forty-five minutes to an hour. While for the most part he kept her facing away from him and sometimes shined a flashlight in her eyes to blind her, she was able to see his face twice. Both views were unobstructed and, while brief, the victim testified that she had "enough time to identify him under any circumstances. I'll never forget the face." She described her assailant's face, build, voice and clothing to the sheriff immediately after the assault. The victim's description of her assailant several months later at the suppression hearing was consistent with the description given to the sheriff just after the attack. Both descriptions were consistent with the defendant's appearance.

The victim's observation of the defendant during the assault met the test of clear and convincing evidence of an independent source sufficient to support her later in-court identification. We conclude that the trial court correctly denied the motion to suppress the in-court identification. *Huguley v. People, supra.*[4]

## VII.

 The defendant also alleges as error the victim's identification of the defendant's voice and her statement at trial that she had an opportunity to hear the defendant's voice subsequent to the assault. The opportunity was at the pre-trial lineup which the prosecution stipulated it would not introduce into evidence. Before trial, the court decided that the victim could testify that she heard the defendant's voice at "some time" after the assault and that it was the same voice as her attacker's. She testified as follows at trial:

Q. Have you had an opportunity to hear the defendant's voice subsequent to the rape?

A. Yes I have.

Q. How is his voice the same or different than the one you heard on the night you were attacked?

A. It's the same voice, it's the same person.

Q. How sure are you of that identification?

A. Positive.

A defendant may be required to speak for identification purposes, and such compelled speech does not violate the constitutional privilege against self-incrimination because that privilege is limited to testimonial, as opposed to demonstrative, evidence. *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). Here, the court heeded defense counsel's opposition to an in-court voice identification and allowed the less dramatic procedure of having the victim testify as to her prior voice identification. Since the defendant could have been compelled to speak, *United States v. Wade, supra*, the trial court did not commit error in allowing a less dramatic procedure to be followed. No reference was made to the lineup and no other evidence from the lineup itself was introduced. The victim's identification of the defendant's voice was proper.

---

4. The fact that the victim's identification of the defendant based on her contact with him during the assault is admissible does not mean that the jury must believe it. The reliability of the identification evidence is an issue of fact to be resolved by the jury. *See* C. Whitebread, *Criminal Procedure* § 18.04 at 362 (1980). Defense counsel cross-examined the victim at trial, addressing such issues as the amount of light present during the attack and the possibility that the assailant's hair might have covered his face. The jury was entitled to consider all of the victim's testimony in evaluating her identification of the defendant.

## VIII.

The defendant's final contention is that it was error for the court to reject two tendered jury instructions on burden of proof as to identity and reliability of eyewitness testimony. The court instead instructed the jury generally as to burden of proof and credibility of witnesses. It is not error to refuse a specific instruction on the credibility of eyewitnesses where a general instruction on credibility is given. *People v. Palumbo*, 192 Colo. 7, 555 P.2d 521 (1976); *People v. Lopez*, 182 Colo. 152, 511 P.2d 889 (1973). The trial court adequately instructed the jury.

Judgment affirmed.

ERICKSON, J., does not participate.